Deaderick, J.,
delivered the opinion of the court:
The bill was filed in the chancery court at Jackson in August, 1871, by complainants, the children and legatees of Kichard T^ewis, deceased, to bold the executors of said testator liable for certain property which they allege came to hands of said executors, or should have come to their hands hy due diligence, and which has not been accounted for hy them.
The said Kichard Lewis died in IVIadison county in 1862, having previously made and published his last will and testament.
Defendants M. P. Lewis, a son of testator, and M. E. Senter, were appointed by the will executors thereof. The *426 will, however, was not proved, nor did the executors qualify until November, 1865.
In the first clause, the testator gives to his wife, for life, the tract of land on which he lived, and in a subsequent clause, he gave to her for life certain negroes, and made other bequests to her of stock, furniture, etc., and then makes certain devises to his children.
Then follows the direction that all his property shall remain together until two years after the time of his death, except so much as may be required to pay his debts, and at the end of two years from the time of his death he directs that his property not devised nor bequeathed specifically shall be sold and the proceeds divided, etc.
The land was cultivated by the negroes, all of whom were kept upon the home farm until January, 1864, less 'than two years after testator’s death, at which time those of the legatees who were of age, and the guardians of two minors, executed bonds to the said M’. P. Lewis and hi. E. Senter, authorizing them to sell the property of testator before the expiration of two years from his death, and by which said M. P. Lewis and hi. E. Senter bound themselves to “do the best they can, the times considered,” and the legatees further bound themselves “to abide by and stand to the acts of said Lewis and Senter, executors of Richard Lewis, deceased, there then being no court in which said Lewis and Senter could be lawfully qualified as executors.”
In compliance with this arrangement a sale of property was made in February, 1864, and the negroes were divided as directed in the will.
The bill seeks to hold the executors liable for the crops of cotton made in the years 1862 and 1863, and as alleged used and appropriated by M. P. Lewis by the permission and acquiescence of said Senter.
That some cotton was made in those two years, during which, according to the will, all the property was to be kept together, we think is made to appear from the testi *427 mony in tbe record. How much was produced,, and bow tbe same was disposed of, it is somewhat difficult satisfactorily to determine, and although tbe fact might easily have been fully proved; we think we may fairly infer from tbe record that it is shown that M. P. Lewis was in control of tbe home farm and tbe slaves thereon up to tbe time of making the agreement and division in January, 1864.
Hpon tbe first bearing in tbe chancery court tbe chancellor was not satisfied to render a decree upon tbe indefinite and unsatisfactory character of tbe evidence, and recommitted tbe master’s report with - directions to take further evidence and to examine either of tbe defendants, if produced by either party. Neither of tbe defendants were examined, and but little, if any, further evidence was adduced, and tbe chancellor proceeded to render a decree, in which he held defendants, as executors, liable for the value of eleven bales of cotton produced in 1862, and six bales produced in 1863, together with thewalue of a horse, and an ox sold during those years by said M. P. Lewis, and from this decree defendants appealed.
One of the slaves, Henry, who belonged to testator at his death, lived upon the lands in 1862, 1863 and 1864, and assisted in making the crop.
He was examined by complainants, and states that eleven bales were made in 1862, and six were made in 1863, and says that the cotton raised in 1862 was ginned at Jackson ’Williams’ gin; that he cannot recollect at what gin the cotton raised in 1863 was ginned, whether at Williams’ or Barnett’s.
George Lewis, a former slave of testator, and one of the hands on the plantation who helped to make the crops of 1862 and 1863, was also examined by complainants, and he stated that'he lived on the home farm in 1862, 1863 and 1864-, and he says the crop of 1862 was sold in Humboldt, that of 1863 at Paducah and that he drove the wagon to Paducah conveying the cotton, and that a remnant of the *428 crop was sold in the seed, at the sale (in February, 1864); he thinks the cotton taken to Paducah was baled at Williams’; that Newell was along on the trip to- Paducah.
Williams testified that he ginned the cotton raised on the Leivis farm in 1862; that there were two- bales;, one weighing 528 pounds, one 490, and 202 pounds over; that he applied for more to make out the bale, and was told there ivas no more; that he Avent to the farm. and. saw no more. Barnett states, in answer to the question Avhether he baled any cotton for Ml P. Lewis in 1862, 1863 and 1864, that he did in 1864; that he put up seven -bales raised upon that farm — three for M. P. Lewis; for Mrs. Lewis, his mother, one; for Moses and Jim, negroes, two; and George, a negro, one. This Avas all of the crop of 1864. At that time, and for some time previous, the Federal military were in occupation of the country, and the oAvners of slaves generally had to give them part of the proceeds to procure their labor.
It will be observed that Henry testifies that eleven bales Avere raised in 1862,-and George, that seven or eight were raised that year. They agree that the cotton that year was ginned by Williams, and Williams testifies that he did gin the cotton raised on the farm of Pichard Lewis, deceased, in 1862, and there were two bales and 202 pounds of it.
Henry states that six bales were raised in 1863, George that there were three or four raised that year; Henry says that.the cotton raised in 1863 was baled at Williams’ or Barnett’s; both these witnesses testify in substance that they baled none that year raised upon the Lewis farm.
The testimony as to the transportation by M. P. Lewis, of cotton to Paducah is equally conflicting with that in regard to the quantity raised in 1862 and 1863.
Newell testifies that he went to Paducah with M. P. Lewis after the sale of the estate property, which sale Ayas in February,- 1864, and that Lewis took four bales which had been ginned at Barnett’s. McAfee says that in the *429 fall of 1863 lie went to Paducab with M. P. Lewis, Newell and others, and M. P. Lewis had a wagon with four mules and four bales of cotton.
It is difficult to determine whether the testimony of ¡hese two witnesses last named refers to the one and the same or to two different trips.
So that the testimony upon the question of the quantity of cotton raised is certainly very far from being satisfactory. But, as the report was recommitted to the master by the chancellor for the purpose of enabling the parties to produce fuller and further evidence, and as little or none in addition, upon the point mainly controverted was adduced, we are constrained to determine the question upon that which is found in the record.
In doing so, we can get but little aid from the testimony of other witnesses than Henry and George, who swear directly as to the number of bales produced. Henry is more Confident in his assertions, and George more cautious, each, however, having an equal opportunity to know the facts about which they depose. The corroborating testimony is very slight, but we are of opinion it tends rather to sustain G eorge than Henry.
In other words, the other testimony does not show that so large a number of bales as seventeen was in the possession, or disposed of by Lewis during the years 1862 and 1863, but would rather lead to the conclusion that Lewis had, during those two years, disposed of a less number of bales than even George testifies was produced upon the farm. But taldng the estimate of George, from ten to twelve bales for the two years, and fixing eleven as the intermediate number, we think will be holding defendant liable for all the cotton that the evidence warrants. There is barely evidence enough in the record to warrant this conclusion, and to warrant the average weight of the bales and prices fixed by the master in his report.
The testimony as to the horse and the ox having been *430 disposed of, and tbeir respective values, is more satisfactory, and defendant’s exceptions to these items were properly overruled by the chancellor.
When the master’s report was recommitted at December term, 1812, for additional proofs as to the quantity and 'value of the cotton raised in 1862 and 1863, defendants requested the court to instruct the master to give them credit in his report for all just claims and debts which they paid for said estate before they qualified as executors. This reference and instruction was refused by the court, and, as we think, improperly. If defendants, or either of them, was to be charged with the cotton in question, it was but reasonable and just that they should be credited with all just claims against the estate, whether for debts paid or otherwise, for which they had not been credited.
The chancellor’s decree will therefore be modified so as to charge seven and one-half bales for the year 1862 and three and one-half for 1863, and so as to allow defendants to show by evidence any claims they may have to any further credit than has been already allowed.
It is insisted for Senter and the sureties, that if it should turn out that M. P. Lewis is indebted to the estate for cotton received by him in 1862 or 1863, that they are not ref-sponsible as co-executor or sureties for the executors, and that a devastavit by one of two executors shall not charge the other, unless he has contributed to it; that the testator having misplaced his confidence in one, shall not operate to the prejudice of the other. 2 Wins, on Exrs., 1649 [3d vol., bottom p. 1820].
This would be so where bond and security were waived, or none, in fact, given. But where bond and security are required to be given, and are in fact given by executors, the bond is a joint obligation upon all the parties executing it, and is in the nature of an agreement to be answerable for the defaults of each other. 1 Perry on Trusts, sec. 426. And if one executor neglects to collect for an un *431 reasonable time a debt due from his co-executor, he will become liable to pay the debt [Ibid., sec. 424], and the executor being in default, his sureties are also liable.
Lewis having received cotton blonging to the estate, was liable to pay its value, and it may be regarded as a debt due to the estate from one of the executors, which it was the duty of the other to have collected. 2 Wins, on Exrs., 1649, note 1.
. Lewis, in equity, should be required to pay to the estate for the property received prior to contract of February, IS64, in the first instance, but the co-executor, Senter and sureties, will be liable also, if it appears upon inquiry by the master that said ÜML P. Lewis was solvent, and that the amount due from him could have been collected by suit within a reasonable time after the qualification of said executors.
The cause will be remanded that the defendants may have opportunity to establish any credits to which they may be entitled to for payments of debts, service, or otherwise, and for further proceedings, and the costs of this court will be paid one-half by complainants and one-half by defendants, and the costs below as may be adjudged by the chancellor.